UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| GWYNNE CHEEK, individually and as<br>independent administrator of, and on behalf<br>of, the ESTATE OF DAVID BRIAN KEITH<br>BRADDOCK, and DAVID BRIAN KEITH<br>BRADDOCK'S heirs-at-law, | § <br> § <br> § <br> § <br> § <br> § | |
| Plaintiff, | § <br> § | |
| v. | § <br> § | CIVIL ACTION NO. 6:21-CV-00396 <br> <br> JURY DEMANDED |
| HILL COUNTY, TEXAS, DANA J. ALLEN,<br>KYLE R. COX, BILLY J. OLSON, JR., and<br>MAMIE D. REECE, | § <br> § <br> § <br> § | |
| Defendants. | § <br> § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> This is a case of a tragic pre-trial inmate suicide resulting from violation of constitutional rights. Defendants' deliberate indifference, objective unreasonableness, and/or policies, practices, and/or customs caused David Braddock's suffering and death.



## Table of Contents

I.    Introductory Allegations .............................................................4
    A.    Parties...........................................................................4
    B.    Jurisdiction and Venue.............................................................7

II.    Factual Allegations ................................................................8
    A.    Introduction.......................................................................8
    B.    David Braddock ...................................................................8
    C.    David's Prior Incarceration in the Hill County jail........................8
    D.    David's September 11, 2019 Arrest...........................................13
    E.    David's Suicide in the Hill County Jail ....................................13
    F.    Witnesses ........................................................................27
        1.    Allen, Dana – Corrections Officer/Booking Officer.............................27
        2.    Cox, Kyle – Captain/Jail Administrator......................................28
        3.    Hernandez, Samantha – Corrections Officer ...................................31
        4.    Higgins, Anna – Corrections Officer .........................................31
        5.    Reece, Mamie – Sergeant/Assistant Administrator .............................31
        6.    Wright, Devery – LVN, MTA (Southern Health Partners) ................33
    G.    Investigations ..................................................................34
        1.    Medical Records and Death Reports.............................................34
            a.    EMS Records .................................................................34
            b.    Autopsy Report ..............................................................34
            c.    Custodial Death Report (Filed with Attorney General)...........35
            d.    Inmate Death Reporting Report (Filed with Texas Commission on Jail Standards)................................................35
        2.    Texas Rangers .................................................................36
        3.    Texas Commission on Jail Standards ..........................................37
    H.    Defendants' Knowledge and Education...........................................44
        1.    Jail Suicides Are a Known, Widespread Problem. .............................44
        2.    Fifth Circuit's Clearly-Established Law: Continuous Observation .....46
    I.    *Monell* Liability of Hill County ............................................47
        1.    Introduction..................................................................47
        2.    Hill County Policies, Practices, and Customs..................................48

| | | | |
|---|---|---|---|
| | a. | Policies, Practices, and/or Customs | 49 |
| | b. | TCJS Records Demonstrating Hill County Practices and/or Customs | 55 |
| III. | | Causes of Action | 62 |
| | A. | 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* | 62 |
| | B. | Remedies for Violation of Constitutional Rights | 65 |
| | C. | Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights | 66 |
| | D. | Cause of Action Against Hill County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights | 69 |
| IV. | | Concluding Allegations and Prayer | 71 |
| | A. | Conditions Precedent | 71 |
| | B. | Use of Documents at Trial or Pretrial Proceedings | 72 |
| | C. | Jury Demand | 72 |
| | D. | Prayer | 72 |

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

## I.      Introductory Allegations

### A.      Parties

1.      Plaintiff Gwynne Cheek ("Ms. Cheek") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Gwynne Cheek sues in her individual capacity and her capacity as the Independent Administrator of the Estate of David Brian Keith Braddock, Deceased. David Brian Keith Braddock is referred to herein at times as "Mr. Braddock" or "David." Gwynne Cheek, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of all of David's wrongful death beneficiaries, including Ms. Cheek, and on behalf of David's estate and all of David's heirs-at-law, including Ms. Cheek (David's mother), Shawna Braddock (David's sister), and Sheila Braddock (David's sister). All of the people listed in the immediately preceding sentence are collectively referred to herein as the "Claimant Heirs." Ms. Cheek asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, Claimant Heirs. Ms. Cheek also sues in her individual capacity and seeks all wrongful death damages available to her. Letters of independent administration were issued to Ms. Cheek in or about October 2020, in Cause Number PR14971, in the County Court of Hill County, Texas, in a case styled *Estate of David Brian Keith Braddock, Deceased.*

2.      Defendant Hill County, Texas ("Hill County") is a Texas county. Hill County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Justin W. Lewis, at Hill County Courthouse, 1 North Waco Street, Hillsboro, Texas 76645, or wherever Honorable County Judge Justin W. Lewis may

be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  Hill County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983 and the United States Constitution).  Hill County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages and death referenced in this pleading.

3.      Defendant Dana J. Allen (sometimes referred to herein as "Ms. Allen, " "Officer Allen," or "Corrections Officer/Booking Officer Allen") is a natural person who resides, is domiciled, and may be served with process at 123 S. Pleasant St., Hillsboro, Texas  76645.  Ms. Allen may also be served with process at her place of employment, Hill County Sheriff's Office, 406 Hall St., Hillsboro, Texas  76645.  Ms. Allen may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Allen at Ms. Allen's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Allen is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Allen was employed by Hill County at all such times and acted or failed to act in the course and scope of her duties for Hill County.

4.      Defendant Kyle R. Cox (sometimes referred to herein as "Mr. Cox," "Officer Cox," "Captain Cox," or "Administrator Cox") is a natural person who resides, is domiciled, and may be served with process at 1741 FM 1242, Hillsboro, Texas 76645. Mr. Cox may also be served with process at his place of employment, Hill County Sheriff's Office, 406 Hall St., Hillsboro, Texas 76645. Mr. Cox may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Cox at Mr. Cox's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Cox is being sued in his individual capacity, and he acted at all relevant times under color of state law. His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading. Mr. Cox was employed by Hill County at all such times and acted or failed to act in the course and scope of his duties for Hill County.

5.      Defendant Billy J. Olson, Jr. (sometimes referred to herein as "Mr. Olson," "Officer Olson," or "Sergeant Olson") is a natural person who resides, is domiciled, and may be served with process at 317 Dewayne Circle, Apt. B, Whitney, Texas 76692. Mr. Olson may also be served with process at his place of employment, Hill County Sheriff's Office, 406 Hall St., Hillsboro, Texas 76645. Mr. Olson may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Olson at Mr. Olson's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Olson is being sued in his individual capacity, and he acted at all relevant times under color of state law. His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and

death referenced in this pleading. Mr. Olson was employed by Hill County at all such times and acted or failed to act in the course and scope of his duties for Hill County.

6.      Defendant Mamie D. Reece (sometimes referred to herein as "Ms. Reece," "Officer Reece," or "Sergeant Reece") is a natural person who resides, is domiciled, and may be served with process at 407 N. Maple St., Malone, Texas 76660. Ms. Reece may also be served with process at her place of employment, McLennan County Sheriff's Office, 3201 Highway 6, Waco, Texas 76701. Ms. Reece may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Reece at Ms. Reece's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Reece is being sued in her individual capacity, and she acted at all relevant times under color of state law. Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading. Ms. Reece was employed by Hill County at all such times and acted or failed to act in the course and scope of her duties for Hill County. All natural person Defendants (Dana J. Allen, Kyle R. Cox, Billy J. Olson, Jr., and Mamie D. Reece) are collectively referred to in this complaint as the "Individual Defendants."

### B.      Jurisdiction and Venue

7.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over Hill County because it is a Texas county. The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, and are citizens of, Texas. Venue is proper in the Waco

Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Hill County, which is in the Waco Division of the United States District Court for the Western District of Texas.

## II.      Factual Allegations

### A.      Introduction

8.      Plaintiff provides in factual allegations sections below the general substance of certain factual allegations. Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility. Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors.

### B.      David Braddock

9.      David was born in Cleburne in 1969. He died a completely unnecessary and preventable death, and he was survived by family members including his mother and two sisters.

### C.      David's Prior Incarceration in the Hill County jail

10.      On August 7, 2019, approximately one month before the incarceration leading to David's death, David was booked into the Hill County jail. A medical information sheet for that

booking indicated that David had been treated for mental illness and had attempted suicide.  A handwritten note on that form also read "to call family to bring meds & CPAP."  That medical intake form was completed by Officer Stacy Parker.

11.     The Screening Form for Suicide and Medical/Mental/Developmental/Impairments contained information indicating that David was at a high risk of suicide.

**Screening Form** | **Suicide and Medical/Mental/Developmental Impairments**

| County: Hill | Date and Time: 8/7/19 2:36 | Name of Screening Officer: |
|---|---|---|
| Inmate's Name: Braddock, David | Gender: M | DOB: | If female, pregnant? Yes ☐No ☐Unknown ☐ |

Serious injury/hospitalization in last 90 days? Yes ☑No ☐If yes, describe: _____ sleep clinic

Currently taking any prescription medications? Yes ☑No ☐If yes, what: Adderall (sleep) Armodapil

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐No ☐If yes, describe: NBP Hurl. chlor. (wetleg-Rahm in T.

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐No ☐If yes, describe:

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used
Meth/weed

*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe ☑ Just from medications

*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☑No ☐If yes, describe:
Wh, They - 6 yrs ago - Car wreck.

*If yes, Notify Medical or Supervisor Immediately

**Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted**

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | ✓ | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | ✓ | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | ✓ | |
| 1c. Have you ever attempted suicide? If so, when and how? | ✓ | | 2013 Here in Jail - Cord |
| 1d. Are you feeling hopeless or have nothing to look forward to? | ✓ | | |
| **IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | ✓ | | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | ✓ | | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | ✓ | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | ✓ | | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | ✓ | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | ✓ | |
| 8. Have you ever received services for emotional or mental health problems? | ✓ | | MHMR - 5 yrs. Hosp. |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | ✓ | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | ✓ | | B: polar |
| 11. In school, were you ever told by teachers that you had difficulty learning? | ✓ | | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | ✓ | |
| **IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | ✓ | | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | ✓ | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | ✓ | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | ✓ | |

Additional Comments (Note CCQ Match here):

| Magistrate Notification Date and Time: 8-7-19 Electronic or Written (Circle) 2229 | Mental Health Notification Date and Time: 8-7-19 2229 | Medical Notification Date and Time: 8-7-19 2229 |
|---|---|---|
| Supervisor Signature, Date and Time: _____ 8/7/19 2154 | | |

12.     It appears that Officer Harrison was the screening officer.  The name of the supervisor signing the form is unclear, but it appears that he/she was a sergeant.  The form was replete with information proving that David had serious mental health issues and was a certain risk of suicide.  In response to the question about any history of drug/alcohol abuse, "meth/weed" was written.  Even though the "No" box was checked in response to the question whether David had had a traumatic brain injury, concussion, or loss of consciousness, the officer wrote beneath that question, "Whitney – 6 yrs. ago – car wreck."  A traumatic brain injury, concussion, and loss of conscious can lead to a change in personality, mood disorders, and aggressiveness.  Upon information and belief, Individual Defendants had learned this information through their education, training, and/or experience.

13.     There were a number of "YES" answers on the form to questions seeking to determine whether David would be a danger to himself.  While all such responses were important, one particularly stands out with regard to the manner in which David would ultimately die in the Hill County jail.  A question read, "Have you ever attempted suicide?  If so, when and how?"  The "YES" box was checked.  In the comments to the right of that answer, the jailer wrote, "2013/Here in Jail – phone cord."  Thus, in addition to other information contained in this complaint showing that the County, through its sheriff and jail administrator, learned that phone cords were used by inmates to commit suicide, this specific information was provided by David to the court only approximately one month before he would ultimately commit suicide in the Hill County jail using a phone cord.  Thus, Hill County's policy, practice, and/or custom of allowing phone cords in cells in which suicidal inmates were kept was implemented and/or maintained with total deliberate indifference as to the death and/or serious injury that would certainly occur.

14.     Answers to other questions in the form indicated that David:

- Was feeling hopeless or had nothing to look forward to;

- Heard noises or voices other people don't seem to hear;

- Currently believed that someone could control his mind or that other people could know his thoughts or read his mind;

- Was feeling down, depressed, or having little interest or pleasure in doing things before his arrest;

- Had nightmares, flashbacks, or repeated thoughts or feelings related to PTSD or something terrible in his past;

- Was worried that someone might hurt or kill him;

- Had received services for emotional or mental health problems ("MHMR – State Hosp.");

- Had been diagnosed as having bipolar disorder when he had received services for emotional or mental health problems; and

- Was told in school that he had difficulty learning.

15.     As a result of that information, in accordance with the form, the jailer was to notify his supervisor, a magistrate judge, and a mental health professional immediately. The fact that all three such persons must be notified was a clear indication that David had serious self-harm and mental health issues.

16.     The jailer also checked the "YES" box in answer to a question in the last section of the form, which asked whether David showed signs of depression (sadness, irritability, emotional flatness). Thus, all information, taken together, just approximately one month before David committed suicide in Hill County jail, showed that David was suicidal.

17.     As a result of information contained on the form, Judge Brassell was notified, on August 7, 2019, that David was "suspected of having mental health issues."  Upon information and belief, Officer Stacy Parker signed the magistrate notification form.

### D.     David's September 11, 2019 Arrest

18.     On September 11, 2019, at approximately 5;30 p.m., Hill County Sheriff's Office Deputy Travis Thurston arrested David for cutting off his ankle monitor.  He was transported to the Hill County jail.  Justice of the Peace Shane Brassell signed an order committing David to the Hill County jail on or about September 12, 2019.

### E.     David's Suicide in the Hill County Jail

19.     David suffered a tragic, completely preventable death as a result of his suicide attempt in the Hill County jail.  Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction, and Hill County's policies, practices, and/or customs, caused, were proximate causes of, and were producing causes of David's suffering and death.

20.     The TCJS requires that all county jails complete, for every inmate admitted to such jails, at the time of booking, the Screening Form for Suicide and Medical/Mental/Developmental Impairments.  As shown above, such a form was completed when David was incarcerated in the Hill County jail on or about August 7, 2019.  One cannot overestimate the importance of information obtained through use of the form, or actions that jailers must take if certain information is obtained.  On September 11, 2019, Hill County Sergeant Mamie Reece completed the form for David. The form was full of answers and information clearly and unambiguously showing that David would commit suicide, as soon as he was able to do so, in the Hill County jail.  There was

zero doubt that David would commit suicide in the Hill County jail if he were given the means and the opportunity to do so. This certainty would be further solidified, if such were possible, when David made more than one failed suicide attempts during the incarceration beginning September 11, 2019, and obviously preceding his unfortunate successful attempt.

21.     The Screening Form for Suicide and Medical/Mental/Developmental Impairments for David clearly showed that David was not just a high risk of suicide, but instead at certain risk of suicide. David's suicide was clearly preventable. All that needed to occur what was specified by the Fifth Circuit Court of Appeals years ago – continuous monitoring. Further, placing a suicidal inmate such as David into a room with a phone cord was known for years to be patently unreasonable and a display of deliberate indifference. The TCJS had notified sheriffs and jail administrators in all Texas counties, in July 2015, that inmates were using phone cords to commit suicide.

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

County: HILL | Date and Time: 9-11-19 1735 | Name of Screening Officer: Ree Ce

Inmate's Name: Braddock, Buen | Gender: M | DOB: ▓▓▓▓ | female, pregnant? Yes ☐No ☐Unknown ☐

Serious injury/hospitalization in last 90 days? Yes ☑No ☐If yes, describe: voices - Narcolpey

Currently taking any prescription medications? Yes ☑No ☐If yes, what: welbutrin -

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☑No ☐If yes, describe: Narcolepsy

Does inmate appear to be under the influence of alcohol or drugs? Yes ☑No ☐If yes, describe: madadil

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used

yes - modaarl

*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe

NO

*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐No ☑If yes, describe:

*If yes, Notify Medical or Supervisor Immediately

Place inmate on suicide watch if Yes to 1a-1d at any time jailer/supervisor believe it is warranted

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | ✓ | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | ✓ | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | ✓ | |
| 1c. Have you ever attempted suicide? If so, when and how? | ✓ | | dosent rember |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | ✓ | |
| IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | ✓ | | bad stuff |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | ✓ | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | ✓ | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | ✓ | | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | ✓ | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | ✓ | | |
| 8. Have you ever received services for emotional or mental health problems? | ✓ | | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | ✓ | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | | N/A |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | ✓ | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | ✓ | |
| IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | ✓ | | irritability |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | ✓ | | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | ✓ | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | ✓ | |

Additional Comments (Note CCQ Match here): NO MATCH

Magistrate Notification Date and Time: 9-11-19@1836 Electronic or Written (Circle)

Mental Health Notification Date and Time 9-11-19@1836

Medical Notification Date and Time: 9-11-19@1836

Supervisor Signature, Date and Time: Sst Reece 9/11/19 1740

22.     Sergeant Reece was both the screening officer and the listed supervisor on the form. David indicated that he would hear voices (when people were not actually speaking) and had narcolepsy.  He also disclosed that he was taking prescription medication Wellbutrin.  Wellbutrin is an antidepressant used to treat a variety of conditions, including depression and other mental/mood disorders.  David also disclosed that he took Modafinil.  Modafinil reduces extreme sleepiness due to narcolepsy and other sleep disorders.

23.     Answers to other questions in the form indicated that David:

- Attempted suicide;

- Was feeling hopeless or had nothing to look forward to;

- Heard noises or voices other people don't seem to hear ("bad stuff");

- Was feeling down, depressed, or having little interest or pleasure in doing things before his arrest;

- Had nightmares, flashbacks, or repeated thoughts or feelings related to PTSD or something terrible in his past;

- Was worried that someone might hurt or kill him;

- Was extremely worried that he would lose his job, position, spouse, significant other, or custody of his children due to arrest;

- Had received services for emotional or mental health problems; and

- Had been in a hospital for emotional/mental health during the past year (regarding which David was unaware of his diagnosis).

24.     As a result of that information, in accordance with the form, Sergeant Reece was to notify her supervisor, a magistrate judge, and mental health professional immediately.  The fact that all three such persons must be notified was a clear indication that David had serious self-

harm issues. Further, upon information and belief, all Individual Defendants knew these indicators on the form showed that David was at an extremely high risk for suicide and had to be treated as if he were actively suicidal. Upon information and belief, they learned this through their education, experience, training, and/or background.

25. Sergeant Reece also checked the "YES" box in answer to four questions in the last section of the form. Each "YES" answer would alone indicate that David could have significant self-harm issues. Taken together, they showed with certainty that David was much more than merely likely to commit suicide. Sergeant Reece noted, by answering those questions "YES," that David:

- Showed signs of depression (sadness, irritability, emotional flatness ["irritability"]);

- Displayed unusual behavior, or acted or spoke strangely (could not focus attention, hearing or seeing things that were not there);

- Was incoherent, disoriented, or showing signs of mental distress; and

- Had visible signs of recent self-harm (cuts or ligature marks).

26. As if the warning bells going off as a result of these answers and observations recorded on the screening form were not enough, David thereafter attempted suicide more than once, in the Hill County jail, before he was ultimately successful. There was no excuse for allowing David to ultimately commit suicide in a secure facility. Defendants would provide the means and opportunity for David to do exactly what he said he would do, which he demonstrated he would do, and which information on the mental health form showed he would do.

27. As a result of information contained on the form, Judge Brassell was notified, on September 11, 2019, at or about 6:36 p.m., that David was "suspected of having mental health

issues." Deputy Courtney Whitfield signed the form, which was not signed by Judge Brassell until September 12, 2019 at 9:42 a.m. David's agitated and actively suicidal state was further demonstrated by authorizations and consent for his for treatment in David's jail file, including a form for tuberculosis screening and treatment, not being signed by David. David was unwilling to sign basic forms that he had signed, upon information and belief, during his previous incarceration beginning approximately one month before.

28.     Plaintiff provides portions of several incident reports below, such reports being drafted on September 11, 12, and 13, 2019. Plaintiff does not contend or necessarily agree that the reports are listed in chronological order, as some reports do not contain a time.

29.     Corrections Officer Rosanna Handy completed an incident report on September 11, 2019, at an unknown time. She wrote:

> On the above date, I OIC Handy was finishing count in Females with CO Arellano and heard over the radio CO Whitfield calling for assistance at F6. I OIC Handy along with CO Morrow, OIC Faglie and CO Cross arrived at F6. CO Whitfeild explained inmate Braddock was trying to hang himself in the shower with his T-shirt. OIC Faglie and CO Morrow entered F6 and I OIC followed and walked inmate Braddock out of the shower. I OIC Handy instructed CO Whitfield to get the chair, and inmate Braddock was crying, claiming "I have nothing to live for". Inmate Braddock was placed in the chair and moved to separation exercise. After checking inmate Braddock's straps CO Morrow was cleaning with the trustees in separation and called over the radio for assistance in separation exercise. I OIC Handy arrived and CO Morrow said he was moving his chair around and asked if I OIC Handy would help secure inmate Braddock. inmate Braddock had his leg out of the straps and would not sit still. Inmate Braddock was cursing at myself OIC Handy and CO Morrow wanting out of the chair. I OIC Handy explained the chair was for his safety, which inmate Braddock became very angry and pulled his leg out of the strap. Inmate Braddock would not comply and put his leg back in the strap, inmate Braddock kept trying to kick both CO Morrow and OIC Handy, fighting to keep his leg free from the strap. After a few minutes CO Morrow and myself OIC Handy finally got inmate Braddock's leg strap back on, and place leg shackles on inmate Braddock to keep his leg secure. End of Report.

30.     This was David's first suicide attempt during the incarceration concluding with his death, and he attempted to commit suicide on the first day of his incarceration. He attempted to

do so in the most common manner used by inmates-hanging through use of a ligature. In fact, the Hill County policies manual informs County employees that such manner of suicide is the most common manner of suicide for inmates. Thus, all Defendants were aware of this information.

31. On September 12, 2019 Rosanna Handy completed an incident report at an unknown time. She wrote:

> On the above date, after the judge came to see inmate Braddock I OIC Handy noticed that inmate Braddock still had on his socks. After the judge was done speaking with inmate Braddock I OIC Handy and Sgt. Reece followed inmate Braddock and told inmate Braddock he had to take off his sock. Inmate Braddock refused and I OIC Handy took off his left sock, and inmate Braddock tried to hide his right foot. I OIC Handy pulled inmate Braddock's right foot out and took his other sock. Inmate Braddock became very upset and started yelling, as I OIC Handy was walking away CO Weeks stated inmate Braddock was ripping his suicide suit. I OIC Handy and Sgt. Reece went back to Detox 2 and called for the door. At this time inmate Braddock was tying his tie his torn up suicide suit around the medical hand rail and then around his neck. I OIC Handy grab him from underneath his arms and moved him away from the torn smock. We then left out of Detox 2 to get the chair out of separation exercise and called CO Monice to come help. As I OIC Handy called for the door inmate Braddock was balled up in his suicide blanket, and I OIC Handy went over and started unwrapping him. Inmate Braddock refused to stand up and CO Monice and myself OIC Handy pulled him out of the blanket and placed inmate Braddock in the chair. Sgt. Reece, CO Moince and myself OIC Handy were strapping inmate Braddock down and inmate Braddock kept trying to move around. At the time Hubbard PD happen to be at booking because he brought someone in, and came over and assisted. Hubbard PD pulled out his taser and instructed inmate Braddock to comply or he would get tased. At that time inmate Braddock sat still and let us strap him in. I OIC Handy went and grabbed a blanket and draped it over inmate Braddock's lap. End of report.

32. This was yet another clear attempt by David to commit suicide. There was no doubt in any Individual Defendant's mind that David would commit suicide as soon as he was given the time to do so, and the tools with which to do it. David had to be continuously monitored to save his life or, in the alternative, transferred to an appropriate mental health facility. All Individual Defendants were, upon information and belief, in close proximity to David at the time of his suicide and thus could have, and should have, assured that he was continuously monitored. In the

alternative, if any Individual Defendant chose not to be in close proximity to David at the time he committed suicide, that decision to not assure that David was continuously monitored was unreasonable and deliberately indifferent.

33.     On September 12, 2019, allegedly at 10:00 a.m., Sergeant Mamie Reece completed an incident report.  She wrote:

> This morning, inmate Braddock came out of his cell to see Judge Brassell for arraignment.  CO Handy and I went into his cell and asked for his socks. He struggled and started cursing at us. We took his socks and he said he was going to continue to kill himself until it was done.  He was wearing socks with his suicide smock. He went back to his cell and tore his smock in half by using the pressure of his foot while pulling with his arms. I advised CO Handy he needed to be put in the restraint chair. She, CO Monice and myself wrestled with him and got him in the restraint chair. He was moved into Seg Exercise to keep him in view. He did not fight anymore. He was removed from the chair and put in another suicide smock per Capt. Motherspau. He told MHMR he would continue to try to kill himself. She will be back tomorrow to speak to him again. He was calm when CO Handy and I removed him from the restraint chair. End of Report.

Thus, in Sergeant Reece's mind, she was certain that David would commit suicide when he was given the time and the ability to do so.  She had to take action, especially considering that she had supervisory ability, to assure that David did not commit suicide in the Hill County jail.

34.     On September 12, 2019 Rosanna Handy completed an incident report at an unknown time.  She wrote:

> On the above date, inmate Braddock started banging his head on the window in separation exercise continuously.  I OIC Handy, CO Faglie, Sgt. Reece and Whitney PD went into separation exercise to put inmate Braddock in the chair. Co Moince came in separation exercise shortly after.  Inmate Braddock went and sat on the ground and refused to get in the chair.  CO Faglie, CO Monice, and Sgt. Reece went to grab inmate Braddock and place him in the chair.  Whitney PD told inmate Braddock to comply or he was going to get tased.  Inmate Braddock sat in the chair and I OIC Handy began to strap inmate Braddock in.  Inmate Braddock was upset stating "I only wanted to lay on a mat," and I OIC Handy told inmate Braddock because of his actions earlier the nurse said no.  Inmate Braddock in not allowed a suicide blanket, since he has already tried to smother his face with it. Per Nurse Devery End of Report

35.     David continued to display self-destructive behavior.  Moreover, as cited in the incident report, Individual Defendnats were well aware of David's intent to commit suicide, and actions he had taken in that regard.

36.     On September 12, 2019 Mark Monice completed an incident report, at an unknown time.  He wrote:

> Offender Braddock was hitting his head on the window when we were called to assist with putting him in the restraint chair.  At first, the Offender was very combative until he decided to walk and seat in the chair.  The offender became compliant and also quiet in Seg separation.

37.     On September 12, 2019 Dylan Berger completed an incident report, at an unknown time.  He wrote:

> I C/O Berger was in the nurses office when I heard some commotion coming from detox 2.  I ran over to see what was going on.  I saw C/O Monice, C/O Handy, and Sgt. Reece putting I/M braddock into the restraint chair.  I helped them get him in the chair.  He was ten taken to separation exercise where he would be in view of the camera.

38.     On September 12, 2019, beginning at 12:17 p.m. and lasting for approximately 25 minutes, Qualified Mental Health Professional ("QMHP") Patti McCall met with David pursuant to a request by Hill County jail staff.  Jail staff told Ms. McCall that David was on suicide observation and tore his suicide vest.  David had then been placed into a restraint chair and put into "excessive segregation for observation."  QMHP McCall spoke with David in segregation, while David was still in the restraint chair.

39.     David disclosed that he took what he referred to as "speed pills" prescribed for his narcolepsy.  He said that he had taken too many such pills the day before.  He also said that jail staff would not let him have his CPAP machine.  David said that he was diagnosed with manic depression/bipolar disorder in Beaumont at MHMR.  Upon information and belief, all Individual Defendants knew that people who commit suicide in Texas jails almost always have been

diagnosed with bipolar disorder and depression. David also said that he had spoken with MHMR in Hillsboro, but that they would not help him.

40. Ms. McCall also wrote in her report:

> [David] reports hearing voices that tell him "to kill himself." [David] reported to Cm "I just want to die, I was in love, is it a crime to be in love. I got nobody that cares about me." [David] reports AH [Auditory Hallucinations]. "I was hearing voices about me, I heard the neighbors screwing, and talking about me. I just want to die." [David] reports living with his sister in a trailer, but voiced "she wants me out and I got nowhere to go."
>
> Thoughts scattered and irrational at time. Mood was depressed with congruent affect. Current suicidal ideation by stating "I'm not going to stop trying as long as I am in jail. No reason to live, don't need to breath[e]. I'm a monster." Reports [auditory] hallucinations stated above. No apparent delusions. Alert and oriented to person, place, time, and situation. CI reports intent of SI [suicidal ideation]. Intermittent eye contact, teary eyed at times. . . . History of substance abuse issues. **Information given to jail staff**. For client's safety, this CM recommended that [David] remains on suicidal observation.

(Emphasis added).

41. As indicated in QMHP McCall's note, she provided to jail staff information she obtained from David. Upon information and belief, all material portions of this information was communicated to Individual Defendants before David's ultimate successful suicide attempt. Employees in the Hill County jail would speak to each other about inmates, especially those like David who were intent on committing suicide. This communication occurred informally, employee-to-employee, as well as, upon information and belief, in post-shift and pre-shift briefings. Further, upon information and belief, all Individual Defendants, through their education, training, and background, knew that substance abuse issues, when combined with serious mental health issues, further increase the likelihood of self-harm.

42. On September 12, 2019, allegedly at 5:42 p.m., Officer Mamie Reece completed an incident report. She wrote:

Inmate Braddock started banging his head on the window because he wanted a blanket.  He is still on a 15 min suicide watch and can't have a blanket.  This was explained to him several times, yet he continued to bang his head.  He was put in the restraint chair by CO Handy, CO Monice, CO Faglie and Officer Martin of Whitney PD came in with his taser and Inmate agreed to walk the remainder of the way on his own.  End of report.

43.     On September 13, 2019 Eliseo Griego completed an incident report, at an unknown time.  He wrote:

At approximately 10:15 a.m. on September 13, 2019 Sgt. Olson and C-O Griego, went down to exercise room 2 to relocate David Braddock to holding Cell 2. He was under the classification of suicide 15 minute watch. When we moved him to holding 2 he was ranting on about seeing the nurse about getting off of suicide watch. 1-M Braddock asked Sgt. Olson about his charges, And Sgt. Olson relayed the information back to 1-M Braddock seemed to be a little upset about his charges and vaguely thanked judge Brassell for his charges. He hollered out a couple of times before he repeatedly started banging on the door. Sgt. Olson returned to the cell and advised 1-M Braddock to calm down and explained to him that he was doing everything in his power. Braddock then went to sit down.

About 10:30 A.M. C-O Allen called for Holding 2 C-O Griego opened and then noticed Captain Cox and Sgt. Reese rushing to the holding cell, and C-O Griego alerted Sgt. Olson that he needed to get to holding 2 and he rushed to the cell to provide assistance. C-O Griego was instructed to open up sally port for emergency personnel. Once they reached the Holding 2 Cell The preformed emergency CPR. Then after about 10 – 15 Min's the wheeled 1-M Braddock out to the ambulance to where they departed to an emergency facility.

44.     The 10:15 am. time estimate was off by nearly 10 minutes.  Once again, Plaintiff does not, by including verbatim certain statements made by certain people admit or contend the times and assertions are exactly correct.  Instead, Plaintiff provides such information as admissions by Defendants as to material portions of certain occurrences which show that Plaintiff's claims are facially plausible  Plaintiff does not intend to make judicial admissions by making any such assertions but instead to provide fair notice to Defendants of the general material substance of Plaintiff's claims.

45.     On September 13, 2019, allegedly at 10:15 a.m., Sergeant Billy Olson completed

an incident report.  He wrote in material part:

> On the above date and time at 01000 Sgt. Olson was in Sgt. Reece office, at this
> time and seen on the Camera that inmate Braddock, David was not in Camera view,
> Sgt. Olson went down talk with him he was just sitting on the toilet, and was very
> calm. Sgt. Olson advised him that he was going have to move him to booking area
> for right now, due to there is Separation Exercise going on today, he stated that he
> would like to get a blanket or mat to lay on or something, Sgt. Olson advised him
> that would look into it for him about Suicide Blanket that all he wanted is to lay
> down, Sgt Olson advised that he did tear a suicide smock all ready yesterday, also
> stated that he does not want any more sandwiches, any more on his suicide tray.
> Around 1015 Sgt. Olson and Corrections Officer Griego went down to separation
> Exercise and escorted inmate Braddock, David to holing 2 and was still on 15 min.
> watch at this time, the Judge Brassell was still at booking area and Sgt. Olson was
> talking with inmate Braddock, David in Holding 2 due to him banging advised him
> to stop and was there something he needed he stated that he need his medication,
> Sgt. Olson advised him that I would get with the nurse Devery about it, and would
> come back let you know, that just going have bear with me, also wanted know his
> bond amount Judge Brassell and Booking Corrections Officer Allen advised me his
> bond amount and Sgt Olson went over talk with him and advised him his bond
> amount to him. Around 01030 Sgt. Olson was advised by Central Control that I was
> needed at Holding 2 that all officers are in holding 2, Sgt. Olson ran down to
> Holding 2 and inmate Braddock, David was laying on the floor on his back and
> Capt. Cox doing Chest Compressions on inmate Braddock.

46.     Once again, the 10:15 a.m. time in this statement is incorrect by nearly 10 minutes.

Further, once again, Plaintiff does not contend that occurrences happened exactly as Sergeant

Olson asserted, but instead provides Sergeant Olson's statement, and other statements in this

pleading, to provide the general material substance of certain occurrences in order to show that

Plaintiff's claims have facial plausibility.

47.     Sergeant Olson had no doubt whatsoever that David would commit suicide as soon

as he had the time and the tools to do so.  Sergeant Olson also had no doubt that Holding Cell 2

contained a phone, with a phone cord that could be used as a ligature.  Sergeant Olson also knew

that once David was placed into Holding Cell 2, that he would not be continuously monitored.

Thus, Sergeant Olson knew that David would be unwatched, have plenty of time alone, and have

the ability to kill himself once he was put into Holding Cell 2. Nevertheless, Sergeant Olson decided to cause David to be placed into that cell. This was unreasonable and unabashed deliberate indifference.

48. Corrections Officer/Booking Officer Allen was apparently the first to find David after his successful suicide attempt. In order to cover up what occurred, including her individual culpability, and as a further demonstration of unreasonable and deliberately indifferent actions, she falsified observation records for David. Officer Allen wrote that a check of David was conducted at 9:00 a.m., and then wrote over that that a check was conducted at 10:00 a.m. Officer Allen then wrote that a check was conducted at 10:15 a.m. Checks did not occur at those times.


Southern Health
Partners
Your Partner in Affordable Inmate Healthcare

# OBSERVATION CELL RECORD

Inmate Name: Braddock, David _____ Cell #: _____

Date/Time Placed in Cell _____ Placed in Cell by _____

Basis for placement (circle):   Suicide Watch   Detoxification   Danger to Self/Others   Medical Observe

Date/Time Medical Personnel Notified _____ Nurse Notified _____

Items Issued (check those that apply): _____ Mattress _____ Bedding _____ Clothing _____ Smock

To be Observed by Medical (list # of times to be observed per shift) __15 min__

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Monitoring Log** | | | | | | | | | | |
| **Activity Codes:** 1=Check, 2=Yelling, 3=Struggling, 4=Crying, 5=Sleeping, 6=Quiet, 7=Relaxed, 8=Mumbling, 9=Walking, 10=Sitting, 11=Fluid accept., 12=Fluid reject, 13=Meal accept, 14=Meal reject, 15=Shower, 16=Toilet, 17=Nurse visit, 18=Range of motion, 19=Mental health visit, 20=Doctor visit | | | | | | | | | | |
| Date | Time | Activity | Initials | Date | Time | Activity | Initials | Date | Time | Activity | Initials |
| | 0639 | 5 | | | | | | | | | |
| | 0647 | 5 | | | | | | | | | |
| | 0653 | 5 | | | | | | | | | |
| | 0713 | 5 | | | | | | | | | |
| | | 5 | | | | | | | | | |
| | 0733 | 5 | | | | | | | | | |
| | | 5 | | | | | | | | | |
| | 0810 | 3 | | | | | | | | | |
| | 0836 | 3 | | | | | | | | | |
| | 0833 | 5 | | | | | | | | | |
| | 0830 | 5 | | | | | | | | | |
| | 0900 | 1, 10, 6 | | | | | | | | | |
| | 0914 | 1, 10, 6 | | | | | | | | | |
| | 0925 | 1, 10, 6 | | | | | | | | | |
| | 0940 | 1, 16, 6 | | | | | | | | | |
| | | 1, 6 | | | | | | | | | |
| | | 1, | | | | | | | | | |

Rangers took original Motherzpan

Date/Time Returned to General Population: _____   Approved By: _____

Placed completed form in Inmate's Medical File.

SHP Form 12.06

(Highlighting in copy received from TCJS).

Officer Allen admitted in a Hill County Sheriff's Office investigation related to David's death that she falsified the governmental record. She gave no excuse other than, in substance, that she knew she had to have specific times on the observation sheet.

### F. Witnesses

49. Plaintiff provides in this section, as above, information at times obtained from statements and/or reports drafted by certain people. Information obtained from these statements and/or reports may be inconsistent at times, and conflict with information in statements and other reports of persons referenced in this pleading. However, indulging all inferences in Plaintiff's favor, even when there are inconsistencies or differences, which Plaintiff only at times points out, Plaintiff states plausible claims for deliberate indifference and/or objective unreasonableness of Individual Defendants and for *Monell* claims against the County.

### 1. Allen, Dana – Corrections Officer/Booking Officer

50. Officer Allen provided a brief written statement regarding David's death. She wrote that, at approximately 10:27 a.m. on Friday, September 13, 2019, she was putting bond amounts into the computer. David was in Holding 2, where "he had been yelling and screaming and banging on the bench a few minutes earlier." Officer Allen "got up to do a round and noticed that [David] had quit yelling." She looked into Holding 2 and did not see David at first. She then looked to the left and saw David sitting under the phone in the cell. She immediately yelled for help and called for Central to give her Holding 2 on the radio and requested backup. Sergeant Reece, Officer Hernandez, and Captain Cox came running. Captain Cox removed the phone cord from David's neck.

51.     Officer Allen thus knew that David was in Holding Cell 2, which was a cell with a phone cord with which David could use as a ligature to commit suicide.  Moreover, she knew that David was not being continuously observed.  Officer Allen chose not to take any action to assure that David was continuously observed and/or not put into or retained in a cell with a phone cord. Even though Hill County's 15-minute observation policy was ineffective and illogical as it related to stopping suicides, Officer Allen did not even check David every 15 minutes as required by County policy.

52.     Moreover, as a result of a Hill County Sheriff's Office investigation into David's death, the Hill County Sheriff's Office determined that Corrections Officer/Booking Officer Allen violated Hill County policies related to David's incarceration.  This is some evidence that Officer Allen violated David's constitutional rights.

### 2.     Cox, Kyle – Captain/Jail Administrator

53.     On September 23, 2019, Captain Cox wrote a statement/report, based in part on his personal knowledge and based in part on information he learned from others and/or from audio and/or video recordings.  He wrote:

> David Braddock, W/M, xx/xx/1969 was booked into the Hill County Jail on 09/11/2019 at approximately 5:30pm.  When he initially came into the facility, he was aggressive and stated he was going to fight as soon as the handcuffs came off of him.  Braddock was moved to a separation cell due to both Detox cells and both Holding cells being occupied.  Several officers moved him to separation where he was placed on suicide watch after he explained that he was going to kill himself before going back to prison.   Braddock refused to complete booking.   At approximately 6:20 pm, CO Courtney Whitfield called for assistance explaining that Braddock was trying to hang himself in the shower of his separation cell with his t-shirt.  Braddock was placed in the restraint chair at 18:23.  While in the restraint chair, Braddock was able to get one of his legs free.  While trying to resecure Braddock, he cussed and attempted to kick CO's multiple times before they were able to secure him. Braddock was later removed from the chair at 23:43 and placed in Detox 2 where the suicide watch continued.

On 09/12/2019, Braddock had ripped up his suicide smock and was trying to tie it around his neck and the handicap handrail. CO's were able to remove the destroyed smock and place Braddock into the restraint chair and move him to Seg Exercise at 10:38. Braddock was later removed from the chair at 14:50 remaining on suicide watch. At 17:37 Braddock began banging his head on the window of Seg Exercise. At 17:41 Braddock was placed back in the restraint chair. Braddock was removed from the restraint chair at 22:50.

On 09/13/2019 at 10:06, Braddock was moved from Seg Exercise to Holding 2 so the inmates in Seg could use the exercise room. At 10:09 Sgt Billy Olson went into Holding 2 to speak with Braddock. At 10:26 CO Dana Allen does a check and observes Braddock hanging from the phone in Holding 2. Allen calls for the door of Holding 2 and then calls for help.

On 09/13/2019 at approximately 10:26 am, I was in my office, when I heard CO Dana Allen call over the radio to open Holding 2 and that she needed help. Holding 2 is located just around the corner from my office. I responded and walked into Holding 2 and observed Inmate David Braddock backed up to the telephone, with the cord coming around his neck from right to left, and the receiver hung back up on the phone, just to the left of his head. Using both hands, I immediately lifted up on the receiver to release Braddock from the phone. Once he was on the floor, I pulled him away from the wall and tried checking for a pulse but was unable to find one. I immediately began chest compressions. Sgt Reece called for someone to call 911 and the staff nurse. Nurse White came in the cell with an AED and an Air Bag. I placed the paddles on Braddock's chest as directed and stood clear while the AED scanned the body. The AED did not engage and said to continue CPR. I continued chest compressions and Nurse White began using the air bag. After a few minutes, we used the AED again, with the same results. I asked CO Anna Higgins to continue chest compression while on put on gloves. I again took over chest compressions. The AED was used again, with the same results. Deputy Travis Thurston then took over chest compression. Hillsboro Fire EMS arrived and Braddock was loaded on the stretcher and transported to Hill Regional Hospital.

Once the ambulance left the jail, I contacted Jason Jouett with Texas Jail Commission and advised him of the situation. CO Allen handed me six observation logs for David Braddock. She advised that the one on top was the current observation log that she just took off the door of Holding 2. The logs are listed as follows:

1. <u>Most Recent Log</u> – It had "David Braddock" for inmate name, and "15 min" for times to be observed. This log had 17 entries.
2. <u>09/11/2019 – 1730</u> – "David Braddock" cell F6, placed in cell by Sgt Reece, Medical Observation, 30 min watch, changed to 15 min watch.
   This log had 54 entries.

3.   09/12/2019 – a supplemental sheet with "David Braddock", in Detox 2, smock only, 15 min watch. This log had 54 entries.
4.   09/12/2019 – Restraint observation Log, "David Braddock", Seg Exercise, restraint type - Chair. This log had 23 entries.
5.   09/12/2019 – Supplemental Restraint observation Log with only 5 entries.
6.   09/11/2019 – Restraint observation Log, "David Braddock", Se[g] Exercise, restraint type - Chair. This log had 15 entries.

These logs were placed on my desk for safe keeping. (Upon returning from the Hospital, copies of the logs were left on my desk with a note, "Ranger took originals.")

Shortly afterwards, I was called by Deputy Thurston and told to respond to Hill Regional Hospital along with Investigator Kyle Nevill and CSI April Stoll. Upon arrival, we were advised that Braddock was still alive and was going to be air lifted to Scott and White Hillcrest in Waco. Once Braddock was transferred to Hillcrest, a deputy was assigned round the clock watch. Myself and Deputy Thurston went and made contact with Braddock's sister, Shawna Braddock at 109 Timmy Dr. in Whitney and advised her of the incident.

This incident is currently being investigated by Texas Ranger Jake Burson. Capt. Justin Motherspau is conducting the administrative investigation.

Deputy Carlos Carrillo and Deputy Mickey Winkle sat with Braddock at Hillcrest on a 12 hour rotation. Inmate David Braddock remained on life support while he was at Hillcrest hospital. On 09/20/2019 at 7:58 pm, Inmate Braddock was pronounced deceased by Justice of Peace Pct 1 Dianne Hensley. At the request of the Hill County Sheriff's Office, Braddock's remains were sent to Southwest Institute of Forensic Science in Dallas for Autopsy.

54.   Captain Cox was in charge at the time of the incident. In fact, Captain Cox was the Jail Administrator – likely the chief supervisor over the entire jail. Thus, he had the ability, and the obligation, to assure that David was not placed into a cell with a phone cord or other item(s) with which David could form a ligature. He also had the obligation to assure that David was continuously monitored. Captain Cox did neither but instead was deliberately indifferent to David's clear and well-known suicidal intent and focus. Captain Cox, even though he admitted his office was close to where David committed suicide, chose to disregard David's serious suicidal intent and failed to appropriately supervise other Individual Defendants. This led to David's death.

### 3.    Hernandez, Samantha – Corrections Officer

55.    Officer Samantha Hernandez provided a written statement related to David's death. She wrote that, on September 13, 2019, at approximately 10:30 a.m., she was in the bathroom when she heard Officer Allen asking for Holding 2. Officer Hernandez went to assist. She saw Captain Cox performing CPR on David.

### 4.    Higgins, Anna – Corrections Officer

56.    Officer Anna Higgins provided a written statement related to David's death on September 13, 2019. She indicated that, at approximately 10:27 a.m., she was working on the female hall. She heard over the radio that Officer Allen needed help in Holding 2. Officer Higgins ran down the hall to Holding 2. Officer Allen was holding the door of Holding 2, and Captain Cox entered the cell. Sergeant Reece said to call "911." Officer Higgins called Hill County dispatch and asked for an ambulance. She then returned to Holding 2 and observed CPR being conducted. She also participated in conducting CPR.

### 5.    Reece, Mamie – Sergeant/Assistant Administrator

57.    Sergeant/Assistant Administrator Mamie Reece provided a written statement related to David's death. Upon information and belief, she was second in charge at the jail. Further, Sergeant Reece ultimately resigned her position after it became clear she spoke about her co-workers in a condescending and disrespectful manner, frequently, using vulgarity. Her written resignation was dated September 26, 2019. This evidenced her deliberate indifference for her co-workers, which presumably extended to inmates such as David.

58.    She wrote that she was not sure of exact times of occurrences. She wrote that, on the morning of September 13, 2019, she spoke with Sergeant Olson regarding "the multiple

inmates that said they wanted to kill themselves or actively tried to kill themselves." Officer Reece also wrote that David was one of the inmates "who had actively tried to hang himself on the evening of 9/11/19." She said that, when David arrived in booking on September 11, 2019, she had corrections Officer Faglie pat down David. Then, Officer Faglie, Officer Monice, Captain Motherspau, Deputy Thurston, and Deputy Nevill moved David to a separation cell after his handcuffs were removed. Officer Reece wrote that she then went home for the day.

59.     Officer Reece wrote that, on September 12, 2019, David was in Detox Cell #2 when she returned to work. David saw Judge Brassell, and he was still wearing socks with his suicide smock. Officer Reece and Officer Handy went into David's cell to get his socks, and David refused to provide them. He removed his suicide smock and used his foot to hold it on the door while pulling the other end with his arms. The suit tore, and David started talking about killing himself. Therefore, Officer Reece called Officer Monice to help Officer Reece put David into the restraint chair. David was put into the restraint chair and moved to Segregation Exercise to be in view of a camera. Officer Reece told Central Control to keep David on a camera. Officer Reece also "kept [David's] cell up on one of [Officer Reece's] screens in [Officer Reece's] office for the day. David agreed to stay calm at some point during the day if he could be removed from the chair. Officer Reece and Officer Handy removed David from the chair. However, within an hour or so, at shift change, David began to bang his head against the window because he wanted a blanket. Officers then put David back into a restraint chair and was told it would be up to the night sergeant to determine when David would be removed from the chair.

60.     On September 13, 2019, Sergeant Reece spoke with Sergeant Olson regarding David. David was still in Segregation Exercise in a suicide smock. Sergeant Olson said he was moving David to Holding Cell 2. Sergeant Reece wrote that she "did not agree with" that

decision. Thus, Sergeant Reece demonstrated in her written statement that she knew David would likely commit suicide if he were put into the holding cell. She knew that David would not be continuously monitored in that cell, and that there was a phone cord with which David could form a ligature. Moreover, upon information and belief, Sergeant Reece decided not to take any action regarding her concern. Thus, she was deliberately indifferent to and acted in an objectively unreasonable manner regarding David and his known fixation on committing suicide.

61.    Sergeant Olson said that day was exercise day for Segregation, and that he needed the exercise room. Sergeant Olson went to speak with David before moving him. Sergeant Reece wrote, "He was not able to move him to a cell in clear view of the booking officer which is Detox 1 and Detox 2, because both cells were occupied with inmates that were also on suicide watch." Sergeant Olson moved David to Holding 2, "where he remained on a 15 minute watch."

62.    Officer Reece wrote that, within a short period of time, she heard Booking Officer Allen screaming, "Help!" Captain Cox and Officer Reece ran towards Officer Allen's voice near Holding 2. When Officer Reece entered Holding 2, Captain Cox was easing David to the floor from a seated position. Officer Reece noted that David's body was warm, but David was unresponsive.


### 6.    Wright, Devery – LVN, MTA (Southern Health Partners)

63.    Nurse Devery Wright provided a statement related to David's death. He wrote that, at approximately 10:27 a.m. on September 13, 2019, he heard the booking officer yell for help, then, "Help now!" The captain and sergeant were on their way when Nurse Wright heard someone saying, "Call 911 now!" Nurse Wright went to the holding tank in which David was incarcerated and saw that CPR was in progress. CPR was continued, and ambulance personnel

arrived at the cell roughly between 10:40 a.m. and 10:41 a.m.  David was transported to Hill Regional Hospital.

### G.        Investigations

#### 1.        Medical Records and Death Reports

##### a.        EMS Records

64.        EMS records for the medical response to David's suicide read in part that a medic was advised that David had hung himself, and that CPR was in progress.  EMS found David on the jail floor with a jailer performing chest compressions.  The record also contained the statement, "The patient was on a suicid[e] watch with 15-minute checks performed on him, Patient was found with a metal telephone cord wrapped around his throat.  Patient has a deep ligature mark across his throat."  The medical record also indicated that David did not have a pulse and had ceased breathing.

##### b.        Autopsy Report

65.        The Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner, performed an autopsy.  Medical Examiner Dr. Grant W. Herndon signed the autopsy report.  The conclusions section of the report read:

> Based on the available case history and autopsy findings, it is my opinion that David Braddock, a 49-year-old white male, died as a result of hanging.  Reports of jail video surveillance indicate that the decedent had no contact with another person between the time he was last seen alive and the time he was found hanging in his cell.

There is therefore no dispute as to the cause of David's death.

c.    Custodial Death Report (Filed with Attorney General)

66.    The Hill County Sheriff's Office filed with the Texas Attorney General a custodial death report regarding David's death.  In it, Hill County admits the substance of allegations made in this pleading – that David was clearly suicidal and had a plan and intent to kill himself in the jail:

> On 09/11/2019, Inmate David Braddock was brought into the Hill County Jail with a warrant for Stalking With Previous Conviction.  Braddock verbally expressed violence and suicide.  Braddock stated that he was going to kill himself before going back to prison.  Braddock was placed in a separation cell on suicide watch. Approximately one hour after entering the facility, Braddock attempted to hang himself in his cell with his shirt.  Braddock was placed in a restraint chair for his protection. Once Braddock appeared to have calmed down, he was removed from the restraint chair and moved to a Detox cell where his suicide watch continued. On 09/12/2019, Braddock ripped up his suicide smock and attempted to hang himself from the handicap handrail in the Detox cell.  Officers were able to take control of Braddock and he was placed in a restraint chair again and moved to Separation Exercise room for video purposes. Braddock was later removed from the restraint chair after calming down.  Braddock remained in Separation Exercise for video purposes.  After approximately 3 hours, Braddock began banging his head on the window of the cell.  Again, Braddock was placed in a restraint chair for his protection.  Several hours later, Braddock was removed from the restraint chair. On 09/13/2019 Braddock was moved from the Separation Exercise cell and placed in a Holding cell. Braddock's last face to face contact with a corrections officer was at 10:09 am.  At 10:26 am, another corrections officer was completing a watch check and discovered Braddock hanging from the cell telephone using the cord around the front of his neck and hanging the receiver back up on the phone. Braddock was immediately removed from the phone and CPR was started. While waiting on EMS to arrive, an AED was used to assist in the CPR process until EMS arrived.  Once EMS arrived, they took over rescue efforts, Braddock was transported to Hill Regional Hospital where he regained a heartbeat and was later transferred to Baylor Scott and White Hillcrest in Waco TX where he remained on life support until he succumbed to his injuries on 09/20/2019.

d.    Inmate Death Reporting Report (Filed with Texas Commission on Jail Standards)

67.    Captain/Jail Administrator Cox forwarded to the Texas Commission on Jail Standards ("TCJS"), on September 21, 2019, a Death Notification regarding David. That notification read:

> Inmate David Braddock was brought into the Jail at the Hill County Sheriff's Office on September 11, 2019 at 5:30pm. On Friday, September 13, 2019 at 10:27 am, inmate David Braddock was found hanging by a telephone cable and receiver. Life saving measures were taken, 911 was called for an ambulance, and inmate David Braddock was transported to Hill Regional Hospital and later transferred to Baylor Scott and White Hillcrest in Waco. Inmate David Braddock remained on life support at Hillcrest Waco until he passed away on September 20, 2019 at 7:58 pm.

The manner of David's death was no surprise to anyone at the Hill County jail. Likewise, the fact that David, or any other suicidal person in a room in a jail with a phone cord would use the phone cord to commit suicide, was also no surprise to any Defendant. All Individual Defendants knew that David would commit suicide when left alone with the means and time to do so.

68.    Captain Cox wrote that David's suicide attempt occurred at the Hill County jail, 406 Hall Street, Hillsboro, Texas 76645. He also indicates that David died at Hillcrest Hospital in Waco. Captain Cox wrote that David was booked into the Hill County jail at 5:30 p.m. on September 11, 2019, and that he died at 7:58 p.m. on September 20, 2019. The report indicates that David committed suicide in Holding Cell #2, and that the last face-to-face contact with David was by Sergeant Billy Olson at 10:09 a.m. on September 13, 2019. The report also indicates that Officer Dana Allen was the Booking Officer who found David after his suicide attempt. The form indicates that David's suicide attempt occurred at 10:26 a.m. on September 13, 2019 – 17 minutes after the alleged last face-to-face check. The form admits that David was on suicide watch and indicates that Ranger Jake Burson would conduct an investigation of David's death.

### 2.    Texas Rangers

69.    The Texas Rangers were called about David's death. The Texas Rangers do not conduct investigations of custodial deaths to determine whether anyone violated constitutional

rights of the decedent, or has civil liability for such death. Instead, the Texas Rangers investigate such deaths only to determine whether there is potential criminal liability.

70.     Ranger James Burson conducted the investigation. He wrote in his report, "[David] Braddock had taken a phone cord, placed it around his neck and then hung the phone back on the hanger. Braddock then sat down, hanging himself." He also wrote that David was alone in his jail cell and was discovered by Hill County Sheriff's Office Detention Officer Janell Allen. It appears, based upon the Ranger's report, that the Ranger took no witness statements and collected no evidence. The Ranger determined that David's death as a suicide.

### 3.     Texas Commission on Jail Standards

71.     The TCJS conducted an investigation of David's death. The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the State agency charged with enforcing bare minimum jail standards.

72.     The TCJS provided a summary of what it determined after its investigation of David's death:

> Investigation reveals I/M Braddock, David was processed into the Hill County Jail on September 11, 2019 at approximately 1730 hours for Bond Violation/Stalking w/Previous Conviction. It was noted I/M Braddock was aggressive during intake and threatened to fight once the handcuffs were removed. The mental health screening form was completed; I/M Braddock stated he had been in the hospital for voices and narcolepsy, was taking Wellbutrin, suffered from narcolepsy, had a history of substance abuse Modafinal (used for narcolepsy, sleepiness). I/M Braddock stated he had attempted suicide but did not remember when and stated he felt hopeless and had nothing to look forward to. I/M Braddock stated he heard voices telling him 'bad stuff," felt down/depressed prior to arrest, suffered from nightmares/flashbacks/repeated thoughts, was worried someone might hurt or kill him, and worried he would lose his job/position/spouse/significant other/children due to arrest. I/M Braddock stated he had been hospitalized and received services for emotional/mental health but did not know his diagnosis. The screener noted I/M Braddock showed signs of irritability and displayed unusual behavior, was incoherent and showed signs of mental illness and had visible signs of self-harm. I/M Braddock stated he was going to kill himself before going back to prison.

I/M Braddock was placed on suicide watch and moved to separation. On September 11, 2019 at approximately 1823 hours, I/M Braddock was observed attempting to hang himself with his t-shirt and was placed in a smock and the restraint chair. I/M Braddock was removed from the restraint chair at approximately 2343 hours.

On September 12, 2019, I/M Braddock ripped up the smock and tried to tie one end around his neck and the other around the handicap rail and was again placed in the restraint chair at approximately 1038. 1/M Braddock was moved to the separation exercise area in the chair. At approximately 1217 hours, a QMHP from MHMR interviewed I/M Braddock and recommended he remain on suicide watch. I/M Braddock was removed from the restraint chair at 1450 hours. At 1737 hours, I/M Braddock began striking his head on the cell window and was placed in the restraint chair again. He was removed from the chair at 2250 hours.

On September 13, 2019 at approximately 1006 hours, I/M Braddock was moved to Holding Cell 2 and immediately began striking the door. A sergeant went to the door to speak to I/M Braddock at 1009 hours. At approximately 1026 hours, an observation round was conducted, and I/M Braddock was found hanging from the phone cord. He was brought down, CPR was initiated, and EMS contacted. EMS arrived and transported I/M Braddock to Hill Regional Hospital. I/M Braddock was later transferred to Baylor Scott & White Hospital in Waco, TX where he remained until he was pronounced deceased on September 20, 2019 at approximately 1958 hours. Final autopsy and Ranger's investigative reports are pending.

73. The TCJS determined that the Hill County jail failed to meet minimum jail standards, and it issued a notice of non-compliance to Hill County. The TCJS did not make a rash decision. TCJS Inspector Wendy Wisneski determined that the TCJS should issue to Hill County a notice of non-compliance. TCJS Assistant Director Shannon Herklotz then reviewed the determination and approved it. TCJS Executive Director Branden Wood agreed and also approved issuance of a notice of non-compliance.

_Suicide_
_2019_

# Death in Custody Review Checklist

Reviewed _____

Entered _____

Video ✓

County/Facility: _Hill_

Inmates Name: _David Braddock_    S.O. / SID Number: _4030280_

Date of Death: _9/20/19_

Booking Sheet: ✓    Autopsy Report: _pending_    CCQ Entry: ✓

Suicide Screening: ✓    Final Report: _pending_    ↓ Magistrate Notification: ↓

Observation Logs: ✓    Other Reports: _Med/MH_    _yes_

Inspector Review:    See attached report.

Signature: _(signature)_    Date: _10/22/19_

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

Assistant Director Review:    See attached report.

Signature: _Shannon J. Herbor_    Date: _10/22/2019_

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

Executive Director Review:    _CONCUR w/NONC & TA FOR OTHER ISSUE_

Signature: _(signature)_    Date: _10/22/19_

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☑ A notice of non-compliance was issued for failing to meet Minimum Jail Standards.

Notice of Non-Compliance Issued:    (Yes) or No      Created 9/20/2017

74.     The determination was made as a result of a special inspection caused by David's suicide.  The TCJS notified the Hill County jail that, unless it cured its noncompliance, it could result an entry of a remedial order.



# Texas Commission on Jail Standards

Hill County Jail

Hillsboro, Texas ~~Administrative Noncompliance~~

October 22, 2019
Date(s) of Inspection

SUBJECT: SPECIAL INSPECTION REPORT

State Law requires periodic inspections of county jail facilities (VTCA, Local Government Code, Chapter 351, VTCA, Government Code, Chapter 511; Chapter 297.8, Texas Commission on Jail Standards).

☑ The facility was inspected on the date(s) indicated above, and it was determined that deficiencies exist. You are urged: (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures. The Commission is available to discuss or assist you with the appropriate corrective measures required.

Failure to initiate and complete corrective measures following receipt of the Notice of Noncompliance may result in the issuance of a Remedial Order (Chapter 297.8, et seq.).

☐ This facility was inspected on the date(s) indicated above. There were no deficiencies noted and upon review of this report by the Executive Director of the Texas Commission on Jail Standards, a certificate of Compliance may be issued per the requirements of VTCA, Chapter 511 and Texas Minimum Jail Standards.

Authenticated:

*Wisneski*

**Wendy Wisneski, TCJS Inspector**

RECEIVED

OCT 22 2019

Texas Commission on Jail Standards

Inter-Office Use Only

Received by: *Jammie Linden*    Date: 10.22.19

Reviewed by: *Shannon J Herlot*    Date: 10/22/2019

cc:    Judge
       Sheriff

Individuals and/or entities regulated by the Texas Commission on Jail Standards shall direct all complaints regarding the commission procedures and functions to the Executive Director at: P.O. Box 12985 Austin, Texas 78711 (512) 463-5505 Fax (512) 463-3185 or at our agency website at www.tcjs.state.tx.us .

75. The TCJS also notified Hill County with specificity as to the bare minimum standard Hill County violated.

TEX COMMISSION ON JAIL STANDA JS
SPECIAL INSPECTION REPORT

Facility Name: Hill County Jail                    Date:          October 22, 2019

| Item | Section | Paragraph | Comments |
|---|---|---|---|
| 1 | 275 | .1 | Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined. |
| | | | After reviewing video evidence and documentation in conjunction with self-reporting by facility administration, it was determined that the face-to-face observation, prior to the inmate being discovered, did not occur. Additionally, the jailer documented two rounds that did not occur. The inmate had been placed on a 15 minute suicide watch. However, instead of 15 minute watches, the video reviewed indicated rounds were being conducted at 30 minute intervals. |

Wendy Wisneski -TCJS Inspector

76. The TCJS also had to issue a technical assistance memorandum to Hill County Sheriff Rodney Watson and Captain Cox, regarding improper observation of David in the restraint chair.

## TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

### TECHNICAL ASSISTANCE MEMORANDUM

To:       Sheriff Rodney Watson, Hill County Sheriff
          Captain Kyle Cox, Jail Administrator Hill County

From:     Wendy Wisneski, TCJS Critical Incident Inspector

Date:     October 22, 2019

Subject:  I/M David Braddock – Death-In-Custody Review

During the review of the custodial death of inmate Gary Huff, one (1) area of concern was identified. Technical assistance is being provided in the following area:

- As per Rule 273.6 Texas Commission on Jail Standards when an inmate is placed in the restraint chair, ensure a documented observation of the inmates is conducted every 15 minutes, at a minimum. The observations should include an assessment of the security of the restraints the circulation to the extremities.

If you have any questions or concerns, feel free to contact me at (512) 463-8081 or (512) 799-6648.

CC:   Jason Jouett, Inspector
      File

Judge Bill Stoudt, Longview, Chair          Sheriff Dennis D. Wilson, Groesbeck          Commissioner Ben Perry, Waco
Jerry W. Lowry, New Caney, Vice Chair       Sheriff Kelly Rowe, Lubbock                  Duane Lock, Southlake
Larry S. May, Sweetwater                    Dr. Esmaeil Porsa, M.D., Parker             Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas

(Reference to inmate Gary Huff is, upon information and belief, a typographical error).

Therefore, upon information and belief, Hill County had a policy, practice, and/or custom of not properly documenting and/or observing inmates in a restraint chair. Further, this likely increased the pain and suffering experienced by David while incarcerated.

77. These violations of known and communicated TCJS standards were as a result of policies, practices, and/or customs of Hill County. Therefore, Hill County is liable for all damages asserted in this pleading as a result of such violations.

### H. Defendants' Knowledge and Education

#### 1. Jail Suicides Are a Known, Widespread Problem.

78. Defendants knew that prisoners frequently commit suicide through hanging and/or asphyxiation, using items in their cells to form ligatures. Individual Defendants possessed this knowledge simply from hearing news media reports over the years, as well as through their experience, education, and/or training.

79. Jail suicides, as all Defendants knew before incarcerating David, are a huge problem in the United States. Over one thousand people died in local jails in 2016, and suicide was the leading cause of death. Further, people in county jails are five times more likely than the general population to have serious mental illness, and two-thirds of such persons have a substance abuse disorder. Many people experience serious medical and mental health crises after they are booked into a jail, including psychological distress and shock of confinement. Defendants also knew when incarcerating David that most jail suicides occur by hanging/strangulation, with inmates using objects available to them as ligatures. Inmates commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.

80. The TCJS mandates use of the Screening Form for Suicide and Medical/Mental/Developmental Impairments. The screening form was drafted to achieve, as

one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

81.    The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.

82.    Suicides were not a novel occurrence and/or unknown issue to Defendants. Defendants were well-aware of the significant risk that David would commit suicide.  Hill County, in addition to having knowledge of the problem with jail suicides, as evidenced in part by any County policies, practices, and/or customs referenced in this pleading in such regard, was put on notice well before David's incarceration that Hill County needed to have the appropriate policies, practices, and/or customs in place to fulfill constitutional obligations to protect inmates.

83.    Upon information and belief, all Defendants knew that most jail suicides occur within the first few minutes, hours, or days of incarceration.  Further, upon information and belief, all Defendants knew that, aside from mental health issues, many suicides occur when a

person is intoxicated at the time he or she arrives at the jail. Further, upon information and belief, all Defendants knew that a significant risk factor for suicide is if the person arrested had been in the midst of a significant family argument and/or been involved in family violence shortly before the arrest.

2.    Fifth Circuit's Clearly-Established Law: Continuous Observation

84. Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit approximately 30 years ago – in 1992 – unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established. In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child. Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical

needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with specificity, and Defendants were charged with knowledge of it.

I.     *Monell* Liability of Hill County

      1.     Introduction

85.     Plaintiff sets forth in this section of the pleading additional facts and allegations supporting claims against Hill County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978). It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of Hill County support such *Monell* claims, and not just facts and allegations set forth in this section. Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein. These policies, practices, and/or customs are pled individually, alternatively, and collectively. Hill County knew, when David was arrested and incarcerated, that its personnel, policies, practices, and/or customs were such that it would not meet its constitutional obligations to provide appropriate care to, and protect, David.

86.     Moreover, Plaintiff sets forth in this pleading certain policies which one or more Individual Defendants violated.  Plaintiff sets forth such policies not necessarily to show liability against Hill County, but rather to show liability against those Individual Defendants.  If a jailer or police offer violates his or her employer's policy, such violation can be some evidence of a constitutional violation.

87.     Hill County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of Hill County as it related to its jail.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the identity of Hill County's chief policymaker(s).

88.     There were several policies, practices, and/or customs of Hill County which were moving forces behind, caused, were producing causes of, and/or proximately caused David's suffering and death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

2.     Hill County Policies, Practices, and Customs

89.     Plaintiff lists beneath this heading Hill County policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including David's death.  Thus, Hill County is liable for all such damages.

<u>a.      Policies, Practices, and/or Customs</u>

90.      Upon information and belief, Hill County had a policy, practice, and/or custom of not transferring to an inpatient mental health facility inmates who clearly would commit suicide at the first opportunity.  There was absolutely no reason for David to continue to be incarcerated in Hill County jail, when he had demonstrated he would commit suicide as soon as he was given the means and opportunity.  He should have been transferred to an appropriate inpatient mental health facility and not left in a cell, alone, with a phone cord, and time to commit suicide.

91.      Hill County also had a policy, practice, and/or custom of incarcerating actively suicidal inmates in a holding cell containing a phone with a cord.  This violated all known jail standards.  Hill County knew when it chose to use such holding cell that the phone it allowed to remain in the cell, with a metal cord, could be used as a ligature.  All Defendants knew that the most common way in which a person commits suicide in jail is through use of a ligature.  Moreover, all Defendants knew that ligatures can be formed using items such as telephone cords, sheets, clothing, shoelaces, and shower curtains.  Hill County also received information years before that it needed to pay strict attention to telephone cords.

92.      On or about July 9, 2015, the TCJS emailed to every Texas sheriff and every Texas county jail administrator, including the Hill County Sheriff and Hill County's jail administrator, a technical assistance memorandum regarding a number of recent suicides completed through use of phone cords in jails.

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

## TECHNICAL ASSISTANCE MEMORANDUM

**To:**        **All Sheriffs and Jail Administrators**
**From:**     **Brandon Wood, Executive Director**
**Date:**      **July 9, 2015**
**Reference:** **Length of Phone Cords in Holding and Detoxification Cells**

Since September of 2014, four (4) suicide hanging deaths involving the use of telephone cords have occurred in Texas jails. These incidents have demonstrated that changes must be made if a jail chooses to place a telephone within a cell. A number of solutions have been suggested, including shortening cords or replacing standard telephones with a cord-free or hands-free type phones. A cord-free or hands-free type inmate phone that has a recessed, cordless handle is available, functioning similarly to a speaker-phone, but with the privacy of a telephone.

In each case, the telephone was located within the holding/detoxification cell, allowing the prisoners unhindered access at any time. Because of these incidents, two of the jails shortened their receiver cords to a total length of 12-16 inches. The telephones were otherwise unaltered, and are still in the same locations. The third jail replaced all phones in the holding, detoxification and separation cells with a cordless, hands-free phone. The fourth jail is planning to replace their phones in holding and detox with a hands-free telephone. These four incidents highlight the need to provide telephones that, if placed within holding cells or other jail cells, do not provide a possible means of suicide.

While there is no minimum jail standard that mandates the length of the telephone cords in Texas county jails, it is the recommendation of this agency that **ALL** phone cords be no more than twelve (12) inches in length. While we cannot prevent every suicide that occurs, it is incumbent upon this agency to share these events with our stakeholders in order to try and prevent future suicide attempts to preserve lives.

**Note: In a Texas jail in 2002, a female inmate successfully committed suicide by hanging herself with a phone cord that measured 15 and ¾ inches in length. The photo evidence of this hanging can be viewed by clicking on the following link: http://www.hawaii.edu/hivandaids/Suicidal_Hangings_in_Jail_Using_Telephone_Cords.pdf

Stanley D. Egger, Abilene, Vice Chair        Sheriff Dennis D. Wilson, Groesbeck        Dr. Michael M. Seale, M.D., Houston
Irene A. Armendariz, Austin        Sheriff Gary Painter, Midland        Larry S. May, Sweetwater
Jerry W. Lowry, New Caney        Allan D. Cain, Carthage

*"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".*
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

After Hill County received that technical assistance memorandum, it was put on notice that it needed to assure that any phone cords in cells had to be so short that it was impossible for them to be used as ligatures. In the alternative, Hill County could simply use cord-free or hands-free

phones. Hill County chose to do neither. It thus knew that its decision to do nothing regarding this problem would certainly lead to serious injury or death, especially when taken together with other policies, practices, and/or customs mentioned in this pleading.

93.     Hill County also had a policy of communicating false information to its jailers which, in substance, essentially indicated that there is no generally-accepted way to predict or prevent suicide attempts. Hill County's suicide policy reads in part, "Psychiatrists and psychologists do not agree on, nor have they demonstrated means of predicting nor preventing suicide attempts by their patients, in or out of the jail setting." This statement is false and drafted in an attempt to lower the bar for Hill County in preventing suicides, such as David's suicide. However, this policy cannot lower the constitutional bar. Hill County also includes in its policy another false statement, "Often our best tools in deterring suicide attempts is a caring, thoughtful word, positive reinforcement, listening to reports from fellow inmates or officers, and observing behavior." This policy trivializes severe mental health issues which must be present for a person to take his own life. These policies taken together, and working with other Hill County policies, were causes of and moving forces behind David's suicide and other damages alleged in this pleading.

94.     Moreover, notwithstanding Hill County's assertion regarding 15-minute checks for suicidal inmates, its suicide prevention policy, Policy Number 11.03, provided constitutionally-inappropriate, illogical, and purely discretionary guidance to Hill County jailers regarding when and how observations would occur:

> Inmates determined by competent medical authority to be a *suicide risk* will be placed in *medical locked* or *watch* status, or placed in general population depending on the recommendations of the physician(s). If suicidal, the inmate will be under watch by at least one officer. This watch can be on a continuous basis or with frequent checks of at least every thirty [30] minutes. During these inspections, the officer will visually observe the inmate.

The inspection or watch can be performed with closed circuit television [CCTV], if the facility is so equipped. If CCTV is used, the officer must be able to see the inmate on the CCTV monitor and hear the sounds in the room through periodic checks.

Regardless of the method of observation, officer(s) assigned these duties will record the inspections in a logbook. Any unusual activity or behavior should be recorded in the log, and periodically reported to senior or medical staff as deemed appropriate by the observing officer.

95.     Thus, Hill County jailers could choose to watch a suicidal inmate every 30 minutes, every 25 minutes, every 3 minutes, every 15 minutes, or whatever time period best suited the jailers' whims.  Further, the TCJS does not allow face-to-face observations to occur via closed-circuit television.  This policy was a recipe for a horrific disaster, and unfortunately the disaster was David's death.

96.     Hill County had a policy, practice, and/or custom of not using fully-licensed jailers and/or telecommunication operators, in the sense that it used such persons with only temporary licenses.  Temporary licenses, under Texas law, upon information and belief, require no testing, no experience, and no jail-related training and/or education.  While Texas law may allow counties to operate in such a manner, the fact that licensing law allows it does not mean that a county should do it.  It also does not mean that it is a reasonable or competent way to run a jail.  A newly-licensed attorney in Texas is generally not competent, for example, to be sole counsel for plaintiffs in a multi-week constitutional rights death jury trial.  Likewise, a person showing up at a jail, and signing on as a jailer, is certainly not competent to act as a jailer unless and until the person has at least completed reasonable training, education, and/or testing.

97.     Perhaps most shocking about this policy, as it related to David's death, was that a primary person involved in David's death, and supervising his Co-Defendants, did not have a permanent jailer's license.  Captain/Jail Administrator Cox was operating under a temporary

jailer's license issued to him on or about April 1, 2019. In fact, he did not receive a normal jailers license until March 31, 2020 – months after David's death. It seems beyond belief that a Texas county, such as Hill County, would appoint a person as administrator over its jail when the person does not even possess the education, testing, background, and/or experience to be a normally-licensed jailer.

98.     Hill County admitted, in a November 22, 2019 letter to the TCJS, that Officer Allen failed to abide by Hill County's 15-minute watch policy for suicidal inmates. That failure is some evidence that Officer Allen committed a constitutional violation. Hill County also admitted that its policies, practices, and/or customs at the time of David's suicide were insufficient, and moreover that it had failed to train its employees regarding the importance of observing actively suicidal inmates:

> Response to the Notice of Non-Compliance.
>
> In response to Chapter 275, Supervision of Inmates. The inmate was placed on a 15 minute suicide watch, which would normally exceed the expectations of this chapter and the Hill County Sheriff's Office Jail Operations plan of a 30 minute watch. Because the 15 minute watch was initiated for the immediate protection of the inmate, the Corrections Officer was required to abide by that watch. The 15 minute watch was initiated for a very particular reason in this case due to the inmate's persistence in accomplishing his end goal of suicide. The Corrections Officer failed to perform the required watch in the time constraint imposed. To rectify this failure on the part of the Sheriff's Office, the following training has been implemented:
>
>> Immediately, shift briefings were given that included the importance of Rule 275.1 and completing the watches in a timely fashion. Each officer was provided with a copy of this Rule. These briefings also included the same for Rule 273.5 and the importance of being able to recognize the signs and symptoms of inmates suffering from Mental Disabilities, and what we must do to protect these inmates from self-harm.
>>
>> The next part of the training would be to prepare and schedule the required annual training for Mental Disabilities/Suicide Prevention, as well as an updated First Aid and CPR class for all jail employees. Having the Supervisors complete the Jail Administrators Exam on MyTcole.

As for the Corrections Officer's documentation of the two rounds that did not occur. The Texas Rangers were initially called to investigate the entire incident of the suicide. The assigned Ranger felt that the investigation involving the round falsifications should be handled internally. This investigation is currently being handled by the Operations Captain of the Hill County Sheriff's Office. This investigation is on-going.

The Hill County Jail has also removed phones with a separate hand set, from all cells that may be used to house inmates with Mental Disabilities that may have an interest in self harm, and replaced these phones with hands free phones. These phones were placed in our two Holding Cells and six separation cells. We are also planning on adding at least 29 new cameras to the jail, which would include inside the above mentioned holding cells and separation cells.

Capt. Kyle R. Cox
Hill County Sheriff's Office
406 Hall St
Hillsboro, TX 76645

99.    Aside from the fact that Hill County's policies, practices, and/or customs, as admitted, were insufficient to prevent David's death, even the 15-minute watch was deliberately indifferent to what Hill County knew would occur with and actively suicidal inmate.  Hill County's 15-minute watch policy could not prevent suicides, because it takes far less time than 15 minutes for a person to commit suicide using a phone cord or other item as a ligature.  Further, Hill County's 15-minute watch policy is particularly troubling, when considered together with its policy, practice, and/or custom of allowing phones with cords in cells in which actively suicidal inmates were incarcerated.

100.    Moreover, upon information and belief, Individual Defendants had access to the intake screening form, referenced above, for David's incarceration in the Hill County jail beginning on or about August 7, 2019.  In the alternative, if Hill County policy, practice, and/or custom did not provide Individual Defendants access to that form, such is a moving force behind and proximately caused all damages referenced in this pleading.   Jailers and others with

responsibility for inmates in the Hill County jail must have access to all information regarding such inmates' mental health histories and suicidal tendencies. If they are not provided such information, then they will obviously be unable to utilize such prior information in analyzing how to house and observe inmates such as David.

                    b.        TCJS Records Demonstrating Hill County Practices and/or Customs

101.    TCJS reports and documents of inspections of the Hill County jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.

102.    On November 8 and 9, 2011, the TCJS inspected the Hill County jail. The TCJS determined that it needed to provide technical assistance to Hill County in two areas. First, when reviewing classification documentation, the TCJS inspector noted that immediate re-assessment did not occur when the Hill County jail took diciplinary action on an inmate. Second, when the TCJS inspector was reviewing Hill County jail face-to-face prisoner observation records, the inspector determined that the night shift would on occasion exceed the 30-minutes between such checks in the areas of holding, detox, and separation cells. These cells housed inmates due to disciplinary reasons or due to such inmates being known to be assaultive or having mental health issues.

103.    On January 7 and 8, 2013, the TCJS inspected the Hill County jail. The inspector provided technical assistance in three areas after determining that Hill County jail was not complying with standards. One such area was the jail's failure to notify a magistrate as required by Section 16.22 of the Texas Code of Criminal Procedure when an inmate is an exact match or a confirmed possible match in the Continuity of Care Query ("CCQ") system. A CCQ must be

conducted for every inmate at the time of intake, to determine whether the inmate has previously received mental health services.

104.    On February 26 and 27, 2014, the TCJS once again inspected the Hill County jail. The TCJS inspector had to provide technical assistance regarding the following issues:

- The Hill County jail needed to review its facility's Emergency Plan and Fire Prevention Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Classification plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill county jail needed to ensure that jailers were classifying inmates that they understood to be held for detainers, warrants, and pending charges. Jailers had to exclude the current charge and they could not use their own agency's warrant.

- The Hill County jail needed to review its facility's Health Services Plan and Mental Health Plan and submit it for approval, because plans had last been approved over 10 years before.

- Hill County had recently promoted Leroy Rodriguez to the position of jail administrator. Mr. Rodriguez did not even have a temporary jailers license, according to TCLEOSE records the jailer resubmitted paper work to TCLEOSE (now TCOLE).

- The Hill County jail needed to review its facility's Sanitation Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Diciplinary Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Grievance Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Recreation Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Education Plan and Library Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Telephone Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Correspondence Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Commissary Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Visitation Plan and submit it for approval, because the plan had last been approved over 10 years before.

- The Hill County jail needed to review its facility's Religious Practicess Plan and submit it for approval, because the plan had last been approved over 10 years before.

105. On January 6 and 7, 2015, the TCJS inspected the Hill County jail. The TCJS determined, as a result of the inspection, that the Hill County jail would be listed as a non-compliant jail. This was due to several deficiencies. Purhaps most important, for purposes of what occurred to David, was the inspector's determination that "[t]here was no documentation to verify that the magistrate was being notified, in writing, within 72 hours after receiving credible information that the inmate may be potentionlly disabled and/or potentially suicidal. The TCJS also had to provide the following technical assistance:

- The Hill County jail had to ensure that Captain Rodriguez participate in quarterly training. The TCJS inspector determined that Captain Rodriguez did not participate in any quarterly training in 2014.

- The Hill County jail had to ensure to maintain a record for annual TB testing of all jailers. The inspector determined that one employee did not have TB testing.

- The Hill County jail had to ensure that all newly-hired jailers were licensed pursuant to TCOLE requirements. There were issues with more than one jailer, including issues with Captain Rodriguez, regarding their licensure.

106.    On February 29, 2016 and March 1, 2016, the TCJS conducted another inspection of the Hill County jail.  The TCJS determined that technical assistance needed to be provided in five areas.  One such area was the Hill County jail's failure to properly classify inmates.  The inspector found that three inmates were not properly classified.  Further, as a continuing issue, the TCJS inspector required the Hill County jail to ensure that all jailers meet TCOLE requirements before performing duties and responsibilities of a jailer.

107.    On March 20, 2017 and March, 21, 2017, the TCJS inspected the Hill County jail. The inspector determined to provide technical assistance due to issues in several areas.  The inspector determined that all newly-hired jailers were not receiving training immediately upon employment as required.  The inspector also required the Hill County jail to ensure that all jailers were consistent with documenting visual face-to-face observations of inmates.

108.    On April 16, 2018, the TCJS inspected the Hill County jail.  The TCJS determined, as a result of the inspection, that the Hill County jail would be listed as non-compliant.  The TCJS determined, "Failure to initiating complete corrective measures following receipt of the Notice of Non-Compliance may result in the issuance of Remedial Order . . . ."  There were numerous errors, related substancially to inmate safety, and which were particularly applicable to David's situation, listed in the jail inspection report.

**Facility Name:** Hill Co. Jail            **Date:**      April 16, 2018

| Item | Section | Paragraph | Comments |
|------|---------|-----------|----------|
| 1 | 265 | .4 (b) | Upon intake, a medical record shall be established and shall be kept separate. |

**A review indicated medical records were not being separated from the inmate files. The CCQ and Screening Form for Suicide and Medical and Medical Development Impairments forms were not placed in the medical file as required.**

| 2 | 271 | .1 (a) | The following principles and procedures shall be addressed: |

(1) inmates shall be classified and housed in the least restrictive housing available without jeopardizing staff, inmates or the public, utilizing risk factors which include any or all of the following:

(A) current offense or conviction;
(B) offense history;
(C) escape history;
(D) institutional disciplinary history;
(E) prior convictions;
(F) alcohol and/or drug abuse; and
(G) stability factors.

**A review of inmate classification files revealed that inmates are not being classified correctly which in turn, lead to inmates being improperly housed.**

| 3 | 271 | .1(a) (4) | Minimum and maximum custody level inmates shall be housed separately. All other custody level inmates should be housed separately. When under direct, visual supervision, inmates of different custody levels may simultaneously participate in work and program activities. |

**A review of classification files revealed that inmates were being improperly classified due to staff errors. As a result, there were numerous minimum and maximum inmates housed together which is a direct violation of standards.**

| 4 | 271 | .1 (b) (3) | Custody Reassessment/Review. A custody reassessment shall be conducted within 30 - 90 days of the Initial Custody Assessment and immediately upon any disciplinary action and/or change in legal status which would affect classification. A documented classification review to determine the necessity for a complete reassessment shall be conducted every 30 - 90 days thereafter. |

**A review of inmate classification files indicated that reassessments were completed but they were done so incorrectly. It was also determined that staff is not completing the reassessment form as a result of disciplinary action or a change in legal status.**

| 5 | 273 | .5 (a) (2) | Identification. Procedures for intake screening to identify inmates who are known to be or observed to be mentally disabled and/or potentially suicidal and procedures for compliance with Code of Criminal Procedure Article 16.22 and referrals to available mental health officials. |

**A review of inmate medical records indicated that jailers are not notifying the magistrate in accordance with minimum jail standards and CCP 16.22 when an inmate is deemed to be mentally disabled and/or potentially suicidal.**

RECEIVED

APR 18 2018

Texas Commission on Jail Standards

6    273    .5 (b)    Screening Instrument. An approved mental disabilities/suicide prevention screening instrument shall be completed immediately on all inmates admitted.

**A review of inmate medical files revealed that there is no documentation to verify that mental health, medical and the supervisor are notified when required/warranted by the Screening Form for Suicide and Medical and Mental Disabilities Impairments.**

7    275    .1    Every facility shall have the appropriate number of jailers at the facility 24 hours each day. **After reviewing a random selection of observation logs for inmates in general population, it was determined that jailers exceeded the required 60 minute face to face observations from 1 minute to 31 minutes on a continual basis.**

8    275    .1    Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.

**After reviewing a random selection of observation logs for inmates that are assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined, it was determined that jailers exceeded the required 30 minute face to face observation from 2 minutes to 36 minutes on a continual basis.**

9    275    .4    Inmates shall be supervised by an adequate number of jailers to comply with state law and this chapter. One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision.

**After reviewing staffing rosters, it was determined that on February 18, 2018, the facility was not staffed to meet the 1:48 jailer to inmate ratio. It was also determined that when the jailer escorts the trusty to the front offices to clean, the facility does not meet the staffing requirements for direct inmate supervision. When a jailer leaves the secure perimeter of the facility for any reason such as perimeter checks and breaks, the facility does not meet the 1:48 ratio as required.**

10    273    .5(a)(5)    Provisions for adequate supervision of inmates who are mentally disabled and/or potentially suicidal and procedures for documenting supervision.

**The jail staff exceeded the required 15 minute observations of inmates on suicide precautions as outlined in the facilities approved operational plan. The jailers routinely exceeded the 15 minute and 30 minute observations.**

*Jackie Benningfield*
Jackie Benningfield, T.C.J.S. Inspector

*William Phariss*
William Phariss, TCJS Inspector

RECEIVED

APR 18 2018

Texas Commission on Jail Standards

109.     The TCJS inspector determined that the CCQ and copies of the Screening Form for Suicide and Medical and Medical Development Impairments Forms were not being placed into inmates' medical files as required.  Inmates also were not being classified correctly, which in turn led to them not being housed correctly.  "As a result, there were numerous minimum and maximum inmates housed together which is a direct violation of standards."  Jailers also were not notifying a magistrate when an inmate was deemed to be mentally disabled and/or potentially suicidal.  There was also no documentation to verify that mental health, medical, and a supervisor were notified when required or warranted by the Screening Form for Suicide and Medical and Medical Development Impairments.

110.     Prisoner observations were also a significatn problem.  The inspector, after reviewing a random selection of observation logs for inmates in general population, determined that jailers exceeded the required 60-minute face-to-face observations by as little as 1 minute and by as much as 31 minutes on a continual basis.  The inspector also noted, after revieing a random selection of observation logs for inmates that were assaultive, potentially suicidal, mentally ill, or who had demonstrated bizzare behavior, that jailers were exceeding the required face-to-face observation period by as little as 2 minutes and by as much as 36 minutes on a continual basis.  Most serious, jail staff exceeded the observation period for inmates on suicide precautions, pursuant to the jail's own standards, "routinely."  Moreover, on one date, the facility was not staffed to meet the minimum staff-to-inmate ratio required by the TCJS.

111.     On May 24, 2019, the TCJS inspected the Hill County jail.  This was just a few months before David's suicide.  The inspector determined that the jail needed technical assistance.  The inspector told jail administration that the jail needed to use a master log for inmates placed in restraints.  Further, during a review of the Mental Disabilities/Suicide Prevention Plan, the

inspector determined that the approved plan did not cover the duration of training. Finally, when the inspector reviewed 30-minute and 60-minute face-to-face observation records, the inspector determined that jail staff were logging checks. However, suspiciously, there were a large number of logged checks that were logged exactly every hour on the hour and exactly every half hour. Thus, jailers were not recording the actual time of face-to-face observations. The TCJS "explained to the new jail administrator" this issue.

112.     On May 11, 2020 and May 12, 2020, the TCJS inspected the Hill County jail. The TCJS had to provide technical assistance regarding suicide recognition/prevention training. When the inspector reviewed staff training, the inspector determined that the Hill County jail's approved operational plan required employees to receive training upon employment and four hours on an annual basis. Jail administration was unable to produce documentation supporting that staff received required suicide recognition/prevention training for calendar year 2019.

III.     Causes of Action

A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

113.  In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

114.  The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472.  Instead, "courts must use an objective standard." *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473.  Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard.  Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

115.  It appears that this objective reasonableness standard is now the law of the land.  In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983.  *Id.* at 418.  The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted).  The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case.  *Id.* at 419-20.  A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted).  However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to

reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and

424-25.[1]

116. The majority opinion gave only three reasons for the court's determination that the

law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

"rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson. Id.* Even so, the Fifth Circuit noted, years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

117. Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

118. The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Ms. Cheek individually and on behalf of Claimant Heirs seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. If David had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for

violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law. Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

## C.     Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

119.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating David's rights to reasonable medical/mental health care, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the 14th Amendment to the United States Constitution. Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

120.   Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading. They wholly or substantially ignored David's obvious serious mental health issues and/or self-harm tendencies, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those needs. They failed to protect David, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of David. Individual Defendants were aware of the excessive risk to David's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death. Moreover, they in fact drew that inference. Individual Defendants violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

121. All Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts asserted in this pleading, all Individual Defendants' actions and inaction meet all three elements. They are therefore also liable to Plaintiff and Claimant Heirs pursuant to this theory.

122. In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

123. Individual Defendants are not entitled to qualified immunity.[2] Their denial of reasonable medical/mental health care, and other actions and/or inaction set forth in this

---

[2]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution. Plaintiff respectfully makes a good faith argument for the

pleading, caused, proximately caused, and/or were producing causes of David's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff and Claimant Heirs.

124. Therefore, David's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- David's conscious physical pain, suffering, and mental anguish;

- David's medical expenses;

- David's funeral expenses; and

---

modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they are entitled to qualified immunity. This should be Individual Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3). Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

- exemplary/punitive damages.

125. Plaintiff also seeks and is entitled to all remedies and damages available to her individually for 42 U.S.C. § 1983 claims. Ms. Cheek seeks such damages as a result of the wrongful death of her son. Those damages were caused and/or proximately caused by Individual Defendants. Therefore, their actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by Ms. Cheek, for which she individually seeks compensation:

- loss of services that Ms. Cheek would have received from David;

- expenses for David's funeral;

- past mental anguish and emotional distress suffered by Ms. Cheek resulting from and caused by David's death;

- future mental anguish and emotional distress suffered by Ms. Cheek resulting from and caused by David's death;

- loss of companionship and/or society that Ms. Cheek would have received from David; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of David's constitutional rights. Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, David's rights and safety. Moreover, Ms. Cheek individually and on behalf of Claimant Heirs seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.     Cause of Action Against Hill County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

126. In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Hill County is liable to Plaintiff and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating David's rights to reasonable medical/mental health care, to be protected, and not to be punished as a pre-trial detainee. These rights are guaranteed by at least the 14th Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

127. Hill County acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times. Hill County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of David's suffering, damages, and death, and all damages suffered by Claimant Heirs.

128. The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker at the pleading stage. Nevertheless, out of an abundance of caution, the sheriff of Hill County was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the Hill County jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, Hill County's commissioners' court was the relevant chief policymaker.

129. Hill County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above. It also acted in an objectively unreasonable manner. Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of David's rights and showed deliberate indifference to the known or obvious

consequences that constitutional violations would occur. Hill County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to David. Therefore, David's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Hill County:

- David's conscious physical pain, suffering, and mental anguish;

- David's medical expenses; and

- David's funeral expenses.

130. Ms. Cheek also individually seeks and is entitled to all remedies and damages available to her for the 42 U.S.C. § 1983 violations. Hill County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Ms. Cheek, for which she individually seeks compensation:

- loss of services that Ms. Cheek would have received from David;

- expenses for David's funeral;

- past mental anguish and emotional distress suffered by Ms. Cheek resulting from and caused by David's death;

- future mental anguish and emotional distress suffered by Ms. Cheek resulting from and caused by David's death; and

- loss of companionship and/or society that Ms. Cheek would have received from David.

Moreover, Plaintiff and Claimant Heirs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.    Concluding Allegations and Prayer

### A.    Conditions Precedent

131. All conditions precedent to assertion of all claims herein have occurred.

B.     Use of Documents at Trial or Pretrial Proceedings

132. Plaintiff and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.     Jury Demand

133. Plaintiff and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

D.     Prayer

134. For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)     actual damages of and for Ms. Cheek, individually and as administrator of the referenced estate, and for Claimant Heirs, including but not necessarily limited to:

   • loss of services that Ms. Cheek would have received from David;

   • medical expenses for David;

   • expenses for David's funeral;

   • Ms. Cheek's past mental anguish and emotional distress resulting from and caused by David's death;

   • Ms. Cheek's future mental anguish and emotional distress resulting from and caused by David's death;

- David's conscious physical pain, suffering, and mental anguish; and

- loss of companionship and/or society that Ms. Cheek would have received from David;

b)   exemplary/punitive damages for Plaintiff and Claimant Heirs, from Individual Defendants;

c)   reasonable and necessary attorneys' fees for Plaintiff and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)   court costs and all other recoverable costs;

e)   prejudgment and postjudgment interest at the highest allowable rates; and

f)   all other relief, legal and equitable, general and special, to which Plaintiff and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


_____/s/ T. Dean Malone_____
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for Plaintiff